## JACK, a negro man, *vs.* MARY MARTIN.

Where in *replevin* there are several avowries, all substantially presenting the same defence, upon some of which *issues of law* are joined and upon others *issues of fact*, and the defendant succeeds upon the issues of law, and judgment is rendered upon the whole record in his favor, leaving the issues of fact undisposed of, the judgment will not, for the omission to dispose of such latter issues, be *reversed*, where it is manifest that had such issues of fact been tried and found for the plaintiff, the court would have given judgment for the defendant *non obstante veredicto.*\*

ERROR from the supreme court. Mary Martin claiming that *Jack*, a negro man, was her *slave* in the state of *Louisiana*, and that he had fled from her service to the city of *New-York*, made application to the recorder of the city of New-

---

\* The above principle is all that was decided in this case in the court for the correction of errors. The supreme court, when the case was before them, not only held the same principle, but after a full examination of the act of congress allowing the granting of a *certificate* for the removal of a slave escaped from service, and of the statute of this state permitting the suing out of a writ *de homine replegiando* in behalf of the slave, held, also, that the act of congress was authorized by the constitution of the United States, and that the statute of this state was *unconstitutional* and *void* as far forth as it conflicts with the law of congress. *See the Opinion delivered in the Supreme Court,* 12 *Wendell,* 314 *to* 329. In the court for the correction of errors two opinions were delivered, one by the CHANCELLOR and the other by *Senator* BISHOP, which are here published. The judgment of the supreme court was *affirmed*, but it was affirmed *solely* on the ground that the plaintiff having by his pleas admitted that he was *the slave of the defendant* and had *escaped from her service*, that therefore the defendant was entitled to judgment; the court expressly declining to pass upon the *constitutionality* of the law of congress and of the statute of this state. As, however, the principles involved are of deep interest to this community, the case is reported, that the views taken by counsel and by the members of the court who delivered opinions may be seen.

*Analysis of the Opinion delivered by the Chancellor :*

The Chancellor denies the power of congress to legislate upon the subject of the escape of slaves from one state to another, and consequently insists that the act of congress of February, 1793, making the certificate of a state magistrate conclusive evidence of the right of a claimant to remove a native born citizen of one state to another state, and thus deprive him of the benefit

York for a *habeas corpus,* on which Jack was brought before the recorder, who, after hearing the proofs and allegations of the parties, granted a *certificate* authorizing the slave to be taken back to *Louisiana.* Jack thereupon sued out a writ *de*

---

of the writ of *habeas corpus* and the right of *trial by jury* in the state where he is found, is unauthorized by the constitution.

He admits, if it be conceded or judicially established that the person claimed as a slave was actually held in servitude in the state from which he fled, that he had escaped from such servitude, and that there is no question as to his identity—that then there is no reasonable objection in principle to his removal back to the state from which he fled, as the most proper place for the trial and final decision of the question whether the claimant is entitled to his services according to the laws of such state ; but he questions whether the framers of the constitution ever intended to authorize the passage of a law containing provisions such as the act of congress on this subject contains, to be enforced where the *facts above referred to are denied* by the alleged slave.

He questions whether any legislation whatever upon this subject is neces sary either by the national or state governments, or was contemplated by the framers of the constitution ; the right of *recaption* on the one hand, and the power to sue out a writ *de homine replegiando* on the other, being secured by the *common law* of the whole confederacy; and is of opinion that the clause in the constitution on this subject was merely intended as a prohibition to state legislation interfering with the right of recaption.

If, however, legislation is necessary, he is of opinion that the state legis- latures are competent to pass the necessary laws to carry the provision of the constitution on this subject into effect ; which laws would be subject to the judicial interpretation of the state tribunals, and to the review of the supreme court of the United States.

He however intimates his opinion that where resort is had to the forms of law to *evade* the constitutional provision on this subject, or to *delay* the reme- dy of the master in obtaining a return of his slave, it is the right and may be- come the duty of the court in which the proceedings are had for such purpo- ses, *to set aside* such proceedings, if not commenced and carried on *in good faith* and upon *probable grounds* that the claim of the master is *invalid.*

He is of opinion that the right to claim a slave, who has escaped from ser- vitude in a state where slavery is allowed, is not confined to the *citizens* of such state ; but that a citizen of this state, where slavery is prohibited by law, the owner of a slave held in servitude in a state where slavery is allowed, may claim such slave if he comes into this state without the consent of his master, and remove him back to the state from which he made his escape.

*Senator* BISHOP holds, in the opinion delivered by him, that the law of con- gress of February, 1793, is fully authorized by the constitution of the U. S.; and that the statute of this state, allowing the slave to sue out a writ *de homi- ne replegiando* after the granting of a *certificate* by a proper officer, and allow- ing him a *trial by jury*, is unconstitutional and void.

*homine replegiando,* returnable in the superior court of common pleas in the city of New-York, and on its return, filed his declaration, stating that Mary Martin, on, &c. at the city of New-York, had taken and continued to hold him upon the false pretence and allegation that he was *her slave,* and that she had the right to transport him to New-Orleans, &c. ; whereas on the contrary, he alleged that he was a freeman. To this declaration the defendant put in *three avowries :* In the first, she avows the taking and detaining, because, on the 27th February, 1830, *at New-Orleans, in the state of Louisiana,* Jack was and ever since hath been and still is *the slave of the defendant,* and, as such slave, bound to labor for, and owing service to her under the laws of the state of Louisiana for and during his life, to wit, at, &c. The defendant avers, that during all the time aforesaid, she was and still is *an inhabitant of New-Orleans* ; that on the 5th April, 1830, Jack escaped from thence and fled to New-York, a fugitive from his service and labor ; that on the 7th August, 1833, she presented to the recorder of New-York an affidavit, setting forth her claim to the services of Jack, and his escape and fleeing into the state of New-York, and that he was then in the city of New-York ; that the recorder issued a writ of *habeas corpus,* directed to the sheriff of New-York, commanding Jack to be taken and brought before him on the next day ; that the sheriff accordingly brought him before the recorder, who *proceeded to hear the proofs and allegations of the defendant and of Jack touching the matter of such suit,* and such proceedings were thereupon had that afterwards, to wit, on the 23d August, it did appear to the recorder that the defendant was entitled to the services of Jack, and he therefore *granted a certificate* to the defendant ·stating, among other things, that it satisfactorily appeared that Jack owed service to the defendant, a resident of the city of New-Orleans, in the state of Louisiana, but then in the city of New York, and allowing the defendant, or any agent by her to be appointed, to take Jack through and out of the state of New York, on the direct route to New Orleans, setting forth the age, size and marks distinguishing Jack ; that Jack was then delivered by the recorder to the sheriff of New-York, who was appointed by the defendant to receive

him for the purpose of his removal to New-Orleans; wherefore, the defendant says she took Jack and detained him, as it was lawful for her to do, for the causes aforesaid, and this, &c.; wherefore she prays judgment and a return, &c. In the *second* avowry, she says she took Jack, and detains him, because he was and still is her *slave,* and this, &c.; wherefore she prays judgment and a return, &c. The *third* avowry is substantially like the first.

To the *first avowry,* the plaintiff put in three pleas: *first,* (after protesting that no such certificate was granted by the recorder as stated in the avowry,) that the *defendant,* at the time when, &c. was and still is wholly and entirely *a resident of the city and county of New-York,* and not of the city of New-Orleans, and this, &c.; wherefore the plaintiff prays judgment and his damages, &c. *Second.* That the defendant, at the time when, &c. was *a citizen of the state of New-York, and could not lawfully hold the plaintiff as a slave,* and this, &c. wherefore, &c. *Third.* That heretofore, while the *defendant* held the plaintiff to service, and claimed that he was her slave by the law of the state of Louisiana, she was a resident of New-Orleans, but that on the first March, 1833, she removed from New-Orleans to New-York, and thereby became a resident of the city of New-York, and a citizen of the state of New-York, *by means whereof the plaintiff became a freeman;* and this, &c. wherefore, &c. To the *second avowry,* the plaintiff pleads, that at the time when, &c. *he was not the slave of the defendant,* but was *a freeman,* concluding to the country with a *similiter;* and to the *third avowry,* a like plea as the last, concluding with a verification and prayer of judgment.

To the *three pleas* put in by the plaintiff to the *first avowry,* the defendant *demurred;* and as to the plea of the plaintiff to the *third avowry,* joined issue.

The superior court decided the three pleas to the first avowry to be bad, and gave judgment for the defendant; that the plaintiff take nothing by his writ, but that he and his caution, &c. be in mercy, &c. and that the defendant go thereof without day, &c. Whereupon the record was removed into the *supreme court* by writ of error, where the judgment of the superior court of common pleas was *affirmed. See the Opinion*

*delivered in that court,* 12 *Wendell* 314 *et seq.* The cause was then removed in behalf of the slave, into this court, and was argued by

*G. Wood & R. Sedgwick,* for the plaintiff in error.

*C. O'Conner,* for the defendant in error.

The following points were presented and argued on the part of the plaintiff in error :

1. Congress have no power, under the constitution of the United States, to legislate upon the subject of fugitives owing service or labor.

2. The provision of the constitution, art. 4, sec. 2, sub, 3, extends to apprentices and indented servants, whether white or black, as well as to slaves, whether Indians or descendants from Africans.

3. The act of congress of 1793 does not preclude the person seized, under a claim to hold him as a fugitive from service, from contesting that such service is due to the claimant in an appropriate common law or statutory suit or action, with the right of *trial by jury* in the courts of this state, where the seizure was made, and where the party seized was at the time of such seizure a citizen *de facto ;* and upon the following grounds : 1. The proceedings under this third subdivision of the second section and fourth article, are not ministerial nor auxiliary to any ulterior judicial proceedings ; but they are altogether judicial, consisting of a claim of property on the one hand, and of personal liberty and security on the other. 2. The common law remedies in relation to this matter are, recaption by the claimant, which is a remedy by the act of the party—a writ *de homine replegiando* by the party seized, which is a common law remedy by suit or action. 3. The recaption is based upon a claim of title to the services of the person seized, which is a right of private property. The suit therefore involves a claim to personal liberty, and damages for the false imprisonment, which are common law rights of value. 4. The statutory remedies under the Revised Statutes correspond with the above, and are valid unless they con-

flict with a constitutional act of congress having concurrent power. 5. The statutory remedy, under the act of congress, if intended to furnish a hearing upon the merits upon both sides, is conclusive as to all the matters directly in issue, and is a proceeding *judicial*, and not *ministerial* or *political*. 6. As such, it is a suit within the meaning of the 7th article of the amendments to the United States constitution, and is unconstitutional for not securing to the parties the trial by jury. 7. The remedy under said act of congress, if an *ex parte* proceeding, with a view to require merely *prima facie* evidence of a right to such service, in order to warrant a removal, in a case involving personal liberty, is also a judicial proceeding. 8. As such, it leaves the controversy, when the party seized sets up a claim to personal liberty and damages for the false imprisonment, untouched as to *that claim*, and as to the evidence in support of it. 9. As such, that claim is left without having undergone the action of the federal legislature, and is still open to be decided either at common law or by the statutory provisions of the state legislature. 10. While the subject matter of that claim is thus open, it is competent for *the state where the seizure takes place* to apply the remedy—because, the gravamen, the subject matter of the claim, and the parties, are within its jurisdiction—because, the party seized being *de facto* a citizen of that state, owing it allegiance and service, is entitled to its protection, until the right to remove is established *in that state*.

4. An officer of the state of New-York can only take such jurisdiction as our statute allows ; and the defendant, by applying to a state magistrate for the remedy given by our law, has consented to be governed by the same throughout.

5. If the act of congress on this subject be constitutional, the jurisdiction thereby conferred is limited, and extends only to persons owing service or labor.

6. If the act of congress be not thus restricted, it is at variance not only with the first article of the amendments, which secures the right of trial by jury, already referred to, but with the sixth article of the amendments, which declares the right of the people to be secure against unreasonable searches and

seizures, and that no warrants shall issue but upon probable cause, &c.

7. The plaintiff in error, by the statutes of this state, became free by reason of the defendant becoming an inhabitant, resident and citizen of this state, which statutes are in conformity with the United States constitution.

8. The court ought not to have given judgment on the whole record, so long as there were issues undisposed of, which might entitle the plaintiff to judgment.

9. The avowry in question was insufficient in various particulars; among others, in not showing by what law the defendant was entitled to the services of the plaintiff. The law should have been stated. And it did not name the agent who was authorized by the recorder to take the plaintiff away.

In support of these points it was urged, *First*, That congress had no power to legislate on the subject of persons held to service or labor in one state *escaping* to another; that no powers can be claimed under the constitution of the United States except such as are expressly given or necessarily implied—referring to Mr. *Madison's* argument in *Hamilton's* works, vol. 2, p. 347. The provision reserving all powers not granted was intended to prevent all possible disputes on this point. *Constitution, art.* 1, § 8, *sub.* 17. 4 *Wheat.* 419, 420, 21. Many rights are given to the union where congress cannot legislate, *ex. gr.* the various cases of prohibition as to the legislation of the several states. By art. 4, § 2, the citizens of each state are secured all the privileges and immunities of citizens in the several states. When was it ever pretended that congress could make laws to enforce these privileges? They are left to the protection of the national judiciary. Again: in the general clause declaring the powers of congress, art. 1, § 8, the power to make laws to carry them into effect is added; and whenever a right is given or created subsequently in the constitution, and where the power is not necessarily implied, it is expressly added. Mr. Madison enumerates all the powers possessed by congress, but makes no mention of that claimed here: see his argument, 2 Hamilton's works, 305 to 350. There are instances of necessary implication which he notices:

as the power to protect against invasion he says implies the power to raise armies, &c. ; but here the power is no more implied, than it is in the clause which declares the force and effect of the records of one state in that of another, and yet the power of making laws to carry that provision into effect, is immediately added in express terms.

*Secondly.* It was insisted that if the act of congress be constitutional, the jurisdiction given is special and limited to the case of an actual *fugitive slave.* This may account for the existence of the act. In this point of view, the free states had little or no interest in the matter. They never could have intended to give up the right belonging to their *free citizens.* Could not a *freeman,* seized under the act of congress, bring trespass on the ground that he was not the *slave* intended to be taken, as well as that B. could sue for an arrest on a *ca. sa.* against A. ? *Vide* 1 *Strange,* 993 ; 2 *Wils.* 385 ; *Willes,* 30. A jurisdiction confined to particular cases or special occasions is a limited jurisdiction. Congress did not intend to alter the settled law as to limited jurisdictions. Where the presiding officer of a court martial was directed to lay before the court all the cases of delinquencies, and the court to proceed to hear and determine, &c. *Laws of U. S. vol. 6, p.* 244, § 8, and *trespass* was brought by a justice of the peace, the only point debated was whether the plaintiff came within the law requiring the peformance of military duty. It was taken for granted that if he did not, that the court had no jurisdiction and were all trespassers. *Wise* v. *Withers,* 3 *Cranch,* 331. There the inquiry as delinquency involved the question whether *justices* were liable to do military duty, as much as the question of fugitive slave or not involves the rights of a freeman, or the question whether freeman or not. Chief Justice Marshall says the decision of such tribunal in a case not within its jurisdiction cannot protect the officer. So in *Miles* v. *Martin,* 19 *Johns. R.* 7, Chief Justice Spencer lays down the same rule, and says no lawyer will dispute this position. This doctrine is not denied but assumed in 12 *Wheaton,* 28, though the judgment in 19 *Johnson* was reversed.

*Thirdly.* The *right of trial by jury* is secured to every citizen by the constitution. The act of congress is clearly void *so far*

as it interferes with that right. If congress could legislate at all upon the subject, they should have provided for a trial by jury. *Parsons* v. *Bedford*, 4 *Peters' U. S. R.* 446. 4 *Black. Comm.* 350. If it be said that this article of the constitution relates to questions of property, it is answered, the defendant claims Jack as his property, and is estopped from saying that this is not a question of property. Besides, the law considers every case of damages as involving a question of property. The constitution has reference to the probable recovery or amount in controversy. Again: it is a question of property as well as of freedom. A freeman has a property in his own limbs as against him who claims to be the owner of them and to direct their use. They are property because they are capable of producing it. If it be said that the rights of the party claimed to be a slave are not finally settled by the summary proceeding had, and that it is like the case of fugitives from justice, it is answered that there is no analogy in the two cases. In the case of the fugitive from justice, the arrest is for trial where the offence was committed; here there is no provision for further proceedings—no security that the person arrested will be carried where he can have a trial. Even in *Wright* v. *Deacon*, 5 *Serg. & Rawle*, 52, Ch. J. Tilghman holds that it will not do to suppose the rights of the party finally disposed of. He says, if the party has a right to freedom, that right is not impaired by the summary proceeding; he is placed just in the situation in which he was before he fled. This is like Dr. Johnson's answer to the complaint of the Americans that they were sent to England to be tried for treason in America. If, said he, they do not wish to be tried for treason in England, let them not commit treason in America. This is the very question—slave or traitor to be tried by a jury *here*. A man sent away as a slave has no means of appealing to a jury of the country as a freeman. Mr. Justice Nelson, in delivering his opinion in the supreme court, says he can apply where he is sent, to the national judiciary: it is answered, his case could not get there until passed upon by the highest tribunal in the state; and if he could obtain a remedy there, what redress would he have for the transportation? That would be treated as legal. In *Virginia*, the judg

ALBANY,
Dec. 1835.

Jack
v.
Martin.

may in his discretion allow the clerk to issue process for one held as a slave. *Rev. Code of Virginia of* 1819, *vol.* 1, 482. *Digest de lois Louisiana*, 223, 7, 32, 48. This shows the condition of a freeman, if taken to the place whence he is said to have fled. No trial by jury is allowed. *See also Hale* v. *Weaver*, 2 *Heywood's N. Car. R.* 55. In *The Commonwealth* v. *Griffith*, 2 *Pick.* 19, a different doctrine is held.

*Fourthly.* The fact that Mary Martin is a citizen of this state makes Jack free. The constitution never meant to interfere between a state and its own citizens. The provision on this subject was intended solely for the benefit of citizen of states where slaves are held, and to protect them against the regulations of other states. Our laws forbid slavery. They do not permit our citizens to hold slaves here, at all, not even to be carried elsewhere. Consequently Jack is free. The law of this state giving the writ *de homine replegiando* in such cases is clearly constitutional as to its citizens. It also implies the doctrine contended for, as it directs that the slave shall be sent to the place of residence of his master.

Points submitted on the part of the defendant in error.

1. The statute of the state of New-York, permitting persons claimed as fugitive slaves, to prosecute a writ of *homine replegiando*, notwithstanding a certificate of removal, is repugnant to the constitution of the United States and the act of congress, and is therefore void.

2. The rights of an individual owning slaves in Louisiana, are not impaired or prejudiced by his becoming an inhabitant of the state of New-York.

3. The adoption, by the defendant in error, of such portion of the practice authorized by the state statute as operated beneficially in maintenance of her rights, does not subject her to the action of those parts of the statute which are unconstitutional, and which operate in derogation of her rights.

4. Congress is empowered to legislate upon the subject of removing fugitives from service.

5. The first avowry shows a perfect right to remove the plaintiff, under the constitution of the United States and the act of congress.

6. Such power was originally exclusive.

7. If such power was not originally exclusive, but concurrent with a like power vested in the state legislatures, yet congress having first exercised the power, thereby absorbed it, and precluded state legislation.

8. The first avowry shows a perfect right to remove the plaintiff in error, according to the constitution of the United States and the statute of the state of New-York taken in connection.

9. The statute of the state of New-York does not prohibit citizens of this state from owning slave property in other states.

10. The failure, in the state statute, to provide for the removal of fugitives owing service to residents of this state, is a mere *casus omissus*, and was not intended to operate as an act of emancipation. The defect is supplied by the terms of the constitution itself, without a resort to the act of congress.

In support of these points it was urged that the *first avowry* being a full answer to the declaration, and the defendant having prevailed on demurrer to all the pleas to that avowry, was entitled to judgment upon the whole record. That the practice in such cases did not require any disposition to be made of the other issues, but on the contrary prohibits as useless labor any proceeding upon them, 1 *Saund. 80, n.* 1. 2 *Burr.* 755. 2 *Cowen*, 572.

The counsel observed that strictly he had the right to insist that the discussion should be confined to the single point presented by the pleas to the first avowry, viz. whether the change of domicil of the defendant, wrought an emancipation of the plaintiff; but as the public interest required that the leading questions should be decided by this court, he was willing to rest the defendant's claim to an affirmance of the judgment of the supreme court solely upon the principles contained in the opinion delivered in that court.

He conceded that the congress of the United States had not power to legislate upon the subject of the escape of slaves from service, unless expressly conferred by the constitution, or necessarily to be implied from powers directly granted. He contended however, that it was manifest that it was intended by the framers of the constitution to vest the general government

with powers to act through its own appropriate functionaries upon all subjects of general interest regulated by the constitution. That it would be most extraordinary if a subject so important as that now under consideration, which so deeply engaged the attention of the convention, and which from its nature might so properly and conveniently be placed under the control of congress, should have been left to the discretion of the state legislatures—a discretion which it was sensibly felt would in many states more probably be exercised in subversion than in support of the interests intended to be provided for. The cotemporaneous legislation of congress upon the subject, the unanimous decisions of the supreme courts of Massachusetts, Pennsylvania and New-York, the greatest non-slaveholding states in the Union, the recent decision of the circuit court in New-York, and a general acquiescence in its exercise for forty years, present a weight of authority in support of the power of congress that seems to render a resort to construction unnecessary. *Wright* v. *Deacon*, 5 *Serg. & Rawle*, 64. *Commonwealth* v. *Griffin*, 2 *Pickering*, 19. 2 *Laws U. S.* 331, *Bioren's ed.*

The power claimed is expressly granted. The constitution declares that slaves escaping from service shall be delivered up "*on claim*" of the party to whom such service may be due. If the words on claim mean a mere informal demand *in pais*, then there is an end of the question, for we act under the constitution itself, and all legislation on the subject by congress or the states is repugnant to our rights secured by the constitution, and therefore void; but if, as every lawyer must admit, they contemplate as a prerequisite to the right of removal a judicial proceeding by which the claim shall be tried and adjudged to be valid, a subject is presented which falls within the limits of judicial power. Art. 3, § 2, declares that the judicial power of the United States extends to all cases in law and equity arising under the constitution. This claim is clearly a legal claim, and its assertion created a case in law arising under the constitution. By art. 3, § 1, the judicial power of the United States is vested in the supreme court and such inferior courts as congress may ordain and establish; and in the general enumeration of powers, art. 1, § 8, congress is not only em-

powered, sub. 9, to constitute tribunals inferior to the su-
preme court, but also, sub. 17, to make all laws which shall
be necessary and proper for carrying into execution the
powers vested in any department of the general government.
In creating each of the officers named in the act, a court, to
pass upon and declare the validity of the claim to service
which should warrant a removal, and in defining the mode
of proceeding to adjudicate upon the claim, congress acted
in strict accordance with the authority granted to constitute
tribunals in which should be exercised the judicial power of
the Union, and to pass such laws as should be necessary to
enable these tribunals to perform their functions.   The act
of congress is not repugnant to the constitution by reason of
the omission to provide for a *trial by jury* in the state in
which the arrest takes place.   The constitution evidently
contemplates a *summary investigation.*   The fugitive is to
be delivered up " on claim."   These words import a sum-
mary proceeding like the word " charged" in the preceding
subdivision.   If it intended to declare that a fugitive servant
should be delivered up after trial and judgment, attended
with all the forms of the common law, the words " on claim"
would be idle.   He could not be said to be delivered up on
claim, whose surrender was the result of a final and conclu-
sive judgment.   The words " on claim" are used for a double
purpose, to declare the necessity of a judicial investigation
prior to the removal, and to define its nature.   The citizens
of the slave-holding states would never have consented to
subject themselves to the necessity of establishing their
claims to their fugitive slaves before juries composed of the
inhabitants of non-slave-holding states.   Indeed the difficul-
ty of establishing the identity by proof, that would satisfy
the strict common law rules of evidence on jury trials, and
the great delay and expense of successive appeals, would
render even the successful prosecution of a claim to service
in the state in which the arrest is made in the ordinary
mode by trial and judgment, vexatious and unprofitable to
the claimant.

If congress had provided by law for the trial of the ques-
tion whether service was due, and authorized a judge without
a jury definitively to decide it, such law might well be deemed

ALBANY,
Dec. 1835.

Jack
v.
Martin.

unconstitutional. Such is not the nature of the act in question. If it can be considered as having any reference to the trial and final decision of the fact, it is a mere regulation as to the *venue* or place of trial. A preliminary decision by a court without jury of a matter of fact, for the purpose of determining the proper venue, which is not final as to the fact itself, but leaves it open for examination on the trial, is not an infraction of the right of trial by jury. The constitution and the act of congress are in exact accordance ; each obviously point to a summary proceeding, not final except for the mere purpose of authorizing the removal. If the fugitive and the claimant are citizens of the state to which the removal is made, congress is not empowered to legislate further upon the subject, nor has the general government any further power over it. The powers of the legislative and judicial departments of the general government are exhausted in the preliminary proceeding of placing the alleged fugitive, to whose service a *prima facie* title has been established, within the jurisdiction of the state, on the laws of which the claim to service is founded. Whether in the subsequent proceedings which may be had to try the question, a jury is allowed by the state law, or whether it tolerates any proceeding at all, is immaterial ; for if the alleged fugitive is in fact a citizen of the state to whose jurisdiction he is remanded, no injustice is done, or at least no principle is violated by the removal. No citizen can claim a right, upon mere general principles, to be exonerated from the obligations imposed upon him by the laws of his own state, or to be relieved from disabilities arising from the defects of its judicial system.

It is the pride and glory of our country to be an asylum for the oppressed of all foreign nations, but it can never be permitted that some of the states shall be erected into places of refuge for fugitives from the justice or the supposed injustice of sister states. Such a principle once admitted into practical operation would destroy all harmony between the states, and inevitably dissever the Union. Its fatal tendency was perceived, and the possibility that it might find advocates foreseen and amply provided against, by the sages who framed the constitution. The provision is a monument of their wisdom.

When the alleged fugitive is not so in fact, but is a citizen of a different state from that to which he is removed, a case is presented which falls within the power of congress to provide for ulterior proceedings; and for such cases congress, in performance of an imperative duty, has made provision. By a writ *de homine replegiando* prosecuted in the circuit court of the United States with the safeguard of a jury trial, the alleged fugitive can assert his freedom, 2 *Laws U. S.* 60, § 9, *Bioren's ed.;* and although probably an action of trespass would not lie for an unjust removal, *Chitty's Gen. Prac.* 48, yet by an action on the case in the same court, full damages could be recovered. If it is suggested that the insufficiency of the amount in controversy might be a barrier to the exercise of jurisdiction by the circuit court, the answer is, this difficulty could not arise unless the plaintiff should unwisely estimate his damages below the jurisdiction of the court. To the writ *de homine replegiando* the objection would not apply under any circumstances. *Lee v. Lee,* 8 *Peters,* 48. This is a complete answer to the suggestion that a free citizen of this state might, by the certificate of a subordinate magistrate, granted without trial or hearing, be hurried away to another state and subjected to perpetual servitude.

Whether the power to legislate on this subject is exclusively vested in congress, or is only concurrent with a like power in the state legislatures, is now immaterial. The cases in the court of dernier resort on constitutional questions, cited by the supreme court, fully sustain the position that if it is a concurrent power, the exercise of it by congress has exhausted the subject and precluded legislation by the states. It hence follows that the laws passed by the state of New-York in relation to fugitives from service are void; that under the constitution and act of congress the certificate of the magistrate is conclusive for the purpose of authorizing the removal; and that any process interrupting its operation is unlawful and void.

But it is said that the laws of the state of New-York prohibit *citizens of this state* from owning slaves any where, and that this restriction does not conflict with the constitutional provision, because it operates only upon our own citizens.

There is nothing in the statutes of this state affording any countenance to this position, except that the certificate authorized by them, directs a removal to the place of residence of the owner. 2 *R. S.* 561, § 11. The form of the certificate is very defectively worded. It could not have been intended that it should operate as an emancipation of all slaves whose owners happened to reside here, or in England, or in any other non-slaveholding state. It could not have been intended that a fugitive slave from *South Carolina,* whose master resided in *Louisiana,* should be removed to *Louisiana.* What was to become of the slave who had several owners residing in various places? It would be contrary to all sound principle to construe the evident oversight in framing the certificate, that must so often be inapplicable, into an affirmative enactment for the emancipation of slaves. Indeed, the only effect which ought to be given to the circumstance is, to diminish the respectful consideration to which this law, emanating from the legislature, would otherwise be entitled. Where a law, from its defective structure and inapplicability to many of the cases for which it was designed to provide, bears evident marks of haste and want of reflection in the framers, a court will with less hesitation entertain the question of its constitutionality.

If, however, the state law was as contended for, it would be repugnant to the constitution and void. The constitution extends its protection to all *slave property*, without reference to the residence of the owner. To concede that this provision is intended for the benefit of the slave-holding states only, would not take this case out of its spirit and object, because it is apparent that the slave-holding states have an interest in protecting the rights of their non-resident slave-holders. It is generally deemed good policy to afford encouragement and protection to the investment of capital by non-residents. Legislative enactments are often made with that view, and unless such investments were deemed a public benefit, they would never have engaged the attention of governments.

The defendant in error relies solely on the constitution of the United States and the act of congress. In applying to a state officer, she conformed to that act. It is probably true that the state officer was not bound to execute the law of con-

gress; but having done so, his act is valid. The defendant has lost no right by adopting the forms prescribed by the state law, because those forms, as far as adopted in this case, involve a compliance with the requisitions of the act of congress. This compliance secures her right, and all beyond it is mere surplusage, and like the legislation from which it sprung, inoperative and void, *utile per inutile non vitiatur.* Rights secured by constitutional provision for great national purposes cannot be lightly taken away, on pretence of a mere technical waiver. *Davis* v. *Packard,* 7 *Peters,* 284.

The averment in relation to the laws of Louisiana is sufficient. Title to slave property was not created by statute in any of the states, and in but very few is it even declared by statute. Usage or the common law was its foundation in this state, and is its foundation in all the slave-holding states. There are numerous statutes regulating the subject, but these do not create the title. Our general averment was sufficient to let in proof of the usage or common law of Louisiana, and to have enabled the plaintiff to traverse it, if it was traversable matter. The court cannot infer that there is a statute or special foundation for our title, when we rest upon an usage and aver its existence, which is not contradicted. If there was any want of certainty in this averment, it should have been pointed out by special demurrer, and is cured by the answer over. But this averment, in connection with the allegation of the plaintiff being a slave in fact, is immaterial and not traversable. The certificate of the magistrate is sufficient, because it is expressed with all the certainty, and contains all the facts required by the act of congress, and that certificate is conclusive. The previous allegation in the avowry, that the plaintiff is in fact a slave, was unnecessary, and could not have been put in issue ; any defects in it are therefore unimportant.

The change of domicil by the defendant in error being immaterial, the pleas are bad ; and the avowry shewing a perfect title under the constitution and act of congress, the judgment is correct and ought to be affirmed.

After advisement, the following opinions were delivered in this court:

By the CHANCELLOR. This cause has been argued in this court upon the assumption, that the decision which is now to be made, necessarily involves the question as to the constitutional right of congress to legislate upon the subject of fugitive slaves and apprentices—or, in the language of the constitution, persons held to service or labor in one state, under the laws thereof, escaping into another; and the decision of the court below is put upon the ground that congress not only has the power to legislate upon the subject, but that their legislation must necessarily be exclusively in relation to this matter; that the law of congress of February 1793 is valid and binding upon the states; under which law any free citizen of this state may be seized as a slave or apprentice who has escaped from servitude, and transported to a distant part of the union, without any trial except a summary examination before a magistrate, who is not even clothed with power to compel the attendance of witnesses upon such investigation; and upon the certificate of such magistrate that he is satisfied that such citizen owes service to the person claiming him under the laws of the state to which he is to be transported. If the decision of this cause turned upon these questions, I am not prepared to say that the congress of the United States had the power, under the constitution, to make the certificate of a state magistrate conclusive evidence of the right of the claimant, to remove a native born citizen of this state to a distant part of the union, so as to deprive him of the benefit of the writ of *habeas corpus* and the right of trial by jury in the state where he is found. In the case of *Martin*, before the circuit court of the United States for the southern district of New-York, to which we were referred on the argument, the fact appears to be assumed that there is no question as to the identity of the individual, whose services are claimed, and that he is in truth a fugitive from the state under whose laws it is alleged that he owes services or labor to the claimant. If these important facts are conceded or judicially established, with the additional fact that the fugitive

was actually claimed, and held in servitude in the state from which he fled, whether rightfully or otherwise, previous to his flight, I admit there can be no reasonable objection in principle to the removal of the person whose services were thus claimed, back to the state from which he fled, as the most proper place for the trial and final decision of the question whether the claimant was legally entitled to his services, according to the laws of that state. But suppose, as is frequently the case, that the question to be tried relates merely to the identity of the person claimed as a fugitive slave or apprentice, he insisting that he is a free native born citizen of the state where he is found residing a the time the claim is made, and that he has never been in the state under whose laws his services are claimed—can it for a moment be supposed that the framers of the constitution intended to authorize the transportation of a person thus claimed to a distant part of the union, as a slave, upon a mere summary examination before an inferior state magistrate, who is clothed with no power to compel the attendance of witnesses to ascertain the truth of the allegations of the respective parties? Whatever others may think upon this subject, I must still be permitted to doubt whether the patriots of the revolution who framed the constitution of the United States, and who had incorporated into the declaration of independence, as one of the justifiable causes of separation from our mother country, that the inhabitants of the colonies had been transported beyond seas for trial, could ever have intended to sanction such a principle as to one who was merely *claimed* as a fugitive from servitude in another state.

I am one of those who have been in the habit of believing, that the state legislatures had general powers to pass laws on all subjects, except those in which they were restricted by the constitution of the United States, or their own local constitutions, and that congress had no power to legislate on any subject, except so far as the power was delegated to it by the constitution of the United States. I have looked in vain among the powers delegated to congress by the constitution, for any general authority to that body to legislate on this subject. It certainly is not contained in any express grant of

power, and it does not appear to be embraced in the general grant of incidental powers contained in the last clause of the constitution relative to the powers of congress. *Const. art.* 1, § 8, *sub.* 17. The law of the United States respecting fugitives from justice and fugitive slaves, is not a law to carry into effect any of the powers expressly granted to congress, "or any other power vested by the constitution in the government of the United States, or any department or officer thereof." It appears to be a law to regulate the exercise of the rights secured to the individual states, or the inhabitants thereof, by the second section of the fourth article of the constitution ; which section, like the ninth section of the first article, merely imposes a restriction and a duty upon other states and individuals in relation to such rights, but *vests no power* in the federal government, or any department or officer thereof, except the *judicial power* of declaring and enforcing the rights secured by the constitution. The act of February, 1793, conferring ministerial powers upon the state magistrates, and regulating the exercise of the powers of the state executive, is certainly not a law to carry into effect the judicial power of the United States; which judicial power cannot be vested in state officers. If the provisions of the constitution, as to fugitive slaves and fugitives from justice, could not be carried into effect without the actual legislation of congress on the subject, perhaps a power of federal legislation might be implied from the constitution itself; but no such power can be inferred from the mere fact that it may be more convenient that congress should exercise the power, than that it should be exercised by the state legislatures. In these cases of fugitive slaves and fugitives from justice, it is not certain that any legislation whatever is necessary, or was contemplated by the framers of the constitution. The provision as to persons escaping from servitude in one state into another, appears by their journal to have been adopted by a unanimous vote of the convention. At that time the existence of involuntary servitude, or the relation of master and servant, was known to and recognized by the laws of every state in the union except Massachusetts, and the legal right of recaption by the master existed in all, as a part of the customary or common

law of the whole confederacy. On the other hand, the common law writ of *homine replegiando,* for the purpose of trying the right of the master to the services of the slave, was well known to the laws of the several states, and was in constant use for that purpose, except so far as it had been superseded by the more summary proceeding by *habeas corpus,* or by local legislation. The object of the framers of the constitution, therefore, was not to provide a new mode by which the master might be enabled to recover the services of his fugitive slave, but merely to restrain the exercise of a power, which the state legislatures respectively would otherwise have possessed, to deprive the master of such pre-existing right of recaption. Under this provision of the constitution, even without any legislation on the subject, the right of the master to claim the fugitive slave is fully secured, so as to give him a valid claim in damages against any one who interferes with the right. *Glen* v. *Hodges, 9 Johns. R.* 67. But even if legislation on this subject is actually necessary, in order to secure to the master the full enjoyment of the right of recaption guarantied to him by the constitution, the state legislatures are perfectly competent to pass the necessary laws to carry this provision of the constitution into full effect. The members of the state legislatures, as well as other state officers, both executive and judicial, being bound by oath to support the constitution, it cannot be legally presumed that they will violate their duty in this respect. The constitution of the United States being the paramount law on this subject, the judicial tribunals of the respective states are bound by their oaths to protect the master's constitutional right of recaption, against any improper state legislation, and against the unauthorized acts of individuals, by which such right may be impaired ; and the supreme court of the United States, as the tribunal of dernier resort on such a question, is possessed of ample powers to correct any erroneous decision which might be made in the state courts against the right of the master. Upon the fullest examination of the subject, therefore, I find it impossible to bring my mind to the conclusion that the framers of the constitution have authorized the congress of the United States to pass a law by which the certificate of a jus-

tice of the peace of the state, shall be made conclusive evidence of the right of the claimant, to remove one who may be a free native born citizen of this state, to a distant part of the union as a slave ; and thereby to deprive such person of the benefit of the writ of *habeas corpus*, as well as of his common law suit to try his right of citizenship in the state where the claim is made, and where he is residing at the time of such claim.

Independent, however, of any legislation on the subject, either by the individual states or by congress, if the person whose services are claimed 'is in fact a fugitive from servitude under the laws of another state, the constitutional provision is imperative, that he shall be delivered up to his master upon claim made ; and any state officer or private citizen, who owes allegiance to the United States and has taken the usual oath to support the constitution thereof, cannot, without incurring the moral guilt of perjury, do any act to deprive the master of his right of recaption, where there is no real doubt that the person whose services are claimed is in fact the slave of the claimant. However much, there-fore, we may deplore the existence of slavery in any part of the union, as a national as well as a local evil, yet, as the right of the master to reclaim his fugitive slave is secured to him by the federal constitution, no good citizen, whose liberty and property are protected by that constitution, will interfere to prevent this provision from being carried into full effect, according to its spirit and intent ; and even where the forms of law are resorted to for the purpose of evading this constitutional provision, or to delay the remedy of the master in obtaining a return of his fugitive slave, it is undoubtedly the right and may become the duty of the court in which any proceedings for that purpose are instituted, to set them aside, if they are not commenced and carried on in good faith, and upon probable grounds for believing that the claim of the master to the services of the supposed slave is invalid.

The constitution of the United States having secured to the master the right of recaption, it is of course a good defence to the present suit, if it is admitted on the record that the plaintiff owed service or labor to the defendant in another state and

had escaped from such servitude, without reference to the validity of the act of congress, or of any state legislature on the subject. It therefore becomes necessary to examine the pleadings in this cause, for the purpose of ascertaining whether such is the fact here. In the defendant's first avowry, she distinctly avers that Jack was her slave at New Orleans, owing service to her under the laws of Louisiana, for and during his natural life, and that he escaped from her service there and fled into this state. This was sufficient, under the constitution, to entitle her to judgment for a return of such slave, unless he could deny the truth of these allegations, or show that he was subsequently manumitted, or legally discharged from service. The first answer which he attempts to give to this avowry is, that the defendant is a *resident* of the city of New-York; and his counsel contend that a citizen of this state cannot be the owner of a slave. The second plea is the same as the first, with the exception that the defendant is there alleged to be a *citizen* of New-York; and the third plea merely sets out the removal of the defendant from the state of Louisiana to New-York to reside, while she held and claimed the plaintiff as a slave, under the laws of Louisiana; by which, as the pleader alleges, she became a citizen of this state, and the plaintiff became a freeman. It will be seen that each of these pleas leaves uncontradicted the two material facts stated in the avowry, to wit, that the plaintiff owed service to the defendant under the laws of Louisiana for life, and that while he owed such service, he escaped from such servitude and fled into this state. Independent of the constitutional provision, the state legislature perhaps would have had the power of manumitting any slave belonging to a citizen of this state, in case such slave should flee into the state from another part of the union were slavery was allowed; but the restriction in the constitution, as to the power of the several states to discharge fugitives from servitude, is sufficiently broad to cover such a case; and if a citizen of New-York is authorized to hold slaves, under the laws of another state where they are so held in servitude, the legislature of this state cannot pass a law which will deprive even one of our

ALBANY,
Dec. 1835.

Jack
v.
Martin.

own citizens of this right to reclaim the fugitive slave who may come to this state without the consent of his master, and to remove him back to the state from which he fled. It stands undenied therefore upon this record, under the first avowry, that the defendant was entitled to the services of the plaintiff, under the guaranty of the federal constitution, and that the judgment of the supreme court was right upon the whole record.

Under the second and third avowries, the fact of slavery was directly put in issue; but inasmuch as each avowry formed a separate and independent defence to the action, the defendant would be entitled to judgment if the first avowry was sustained, although the verdict should be against her upon the issues joined under the other avowries. It would therefore have been a useless expense to have gone down to trial upon these issues, when in no possible event could there have been a judgment in favor of the plaintiff for any thing more than the mere costs of those issues.

The conclusion at which I have arrived in this case, therefore, is, that the judgment of the supreme court should be affirmed, with costs; and that the damages which the defendant in error has sustained by the delay and vexation caused by this writ of error should be awarded to her.

By Senator BISHOP. The decision of this cause involves a principle of some moment, not only as to the rights of the slave-holding states in reclaiming their fugitive slaves, but also as to the permanency of the government under which we live. Divested of all the drapery which is thrown around it by the pleadings and technical objections which have been urged, the question is presented whether the law of the congress of the United States in reference to the apprehension of fugitive slaves, passed at the second session under the constitution, is authorized by any power conferred upon congress by the constitution, and consequently whether the law of this state authorizing a writ *de homine replegiando*, which provides for the arrest of runaway slaves in a manner somewhat different from the law of congress, can be sustained by the state authorities.

The doctrine at this day is too well settled to admit of cavil or doubt, not only by judicial decisions but by the voice of the American people, that the several states have reserved to themselves all the rights and immunities of independent sovereignties, except such powers as are conferred upon congress by the explicit language of the constitution, or are clearly and unequivocally to be implied from it. In arriving at a conclusion upon these points it becomes necessary to inquire what powers have been conferred upon congress by the constitution; and if upon such inquiry it be found that the law of congress in reference to fugitive slaves is recognized by the express or implied powers of the constitution, whether the state law must yield to the law of congress. The fourth article and second section of the constitution of the United States declares, that " no person held to service in one state, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due." The first article, section eight, and last clause of the constitution, authorizes congress to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by the constitution in the government of the United States, or in any department or officer thereof; not only giving to congress certain powers there enumerated, but giving authority to legislate upon an infinite variety of subjects which the framers of the constitution evidently anticipated would arise under it when the practical operation of the government was more fully and completely developed. The doctrine laid down in the *Federalist* is, that the constitution, is defining the power of congress, evidently specified those which were matters of immediate and general interest, leaving congress to regulate other matters by law as the exigency of the case might require. Upon the authority of the foregoing clauses of the constitution, congress passed a law at its second session, substantially authorizing the owner of any fugitive slave, his agent or attorney, to seize such slave and take him before a judge of the circuit or district court of the United States within the state, or before any magistrate in the state where such

ALBANY,
Dec. 1835.

Jack
v.
Martin.

ALBANY,
Dec. 1835.

Jack
v.
Martin.

seizure was made, and upon full and satisfactory proof, to be made to such judge or magistrate, that the individual so seized in fact is a slave and owes service to the person claiming him, it becomes the duty of the magistrate to deliver a certificate of such fact to the owner, which shall confer upon him power to remove the slave to the state from which he fled. This law of congress has been universally recognized by all the states in the union as constitutional, and paramount over all state authority, and hundreds of fugitive slaves have been removed under its provisions. I cannot but deem it somewhat singular that it should have been reserved for the superior wisdom of modern days, or perhaps I may venture the intimation, to the zealous efforts for a premature and immediate abolition of slavery, to have discovered that a law which was adopted by our forefathers, practised upon by their descendants, and which has been so benign in its practical effects, is unconstitutional and void. Under the law of congress above referred to, the plaintiff in error was seized, and the requisite proof having been made before the recorder of the city of New-York, a certificate was granted by him, authorizing the removal of the slave to the state of Louisiana, the place from which he fled. A writ *de homine replegiando*, authorized by the laws of this state, which gives the person seized a trial by jury, was resorted to by the plaintiff in error, and hence the decision of this court is sought as to the validity of those laws.

In the case of *Gibbons* v. *Ogden*, 9 *Wheaton*, the supreme court of the United States, in speaking of the powers of congress upon this subject, say : " No direct general power over these objects is granted to congress, and consequently they remain subject to state legislation. If the legislative power of the union can reach them, it must be where the power is expressly given for a special purpose, or is clearly incidental to some power which is expressly given." This case, upon the argument, was relied upon by the counsel for the plaintiff in error, as strongly demonstrating the unconstitutionality of the act of congress. The authority of that position is not questioned, but it does not follow that the principles of that case in any manner militate against the positions contended for by the defendant in error. In a subsequent part of

the same case, Chief Justice Marshall says that " it is a sound rule of construction in arriving at incidental powers, to take into consideration the motives and objects of the framers of the constitution." The abstract proposition of the justice or injustice of slavery, is wholly irrelevant here, and I apprehend ought not to have the slightest influence upon any member of this court. That is a question upon which all are agreed. Slavery is abhored in all nations where the light of civilization and refinement has penetrated, as repugnant to every principle of justice and humanity, and deserving the condemnation of God and man. These sentiments were adopted by the slave-holding states at the period of the adoption of the constitution, and the same feeling, to a great extent, prevails in those states now. It is not that they advocate the principle of slavery, but they say it is an evil entailed upon them by their ancestors, a remedy for which, without endangering their very existence, has not yet been discovered. In the absence of any precise authority in the constitution in regard to the removal of fugitive slaves, it becomes important to inquire as to the motives of the members of the convention who represented the slave-holding states, and the considerations which were likely to operate most powerfully upon them. There was no subject agitated in the convention which created a more intense and deep interest among the slave-holding states, than that of providing a certain and secure mode of perpetuating the bondage of slaves within their boundaries. Difficulties of the most perplexing and harrassing character, in reference to fugitive slaves, had occurred previous to the adoption of the constitution ; and it is absurd to suppose that the members of the convention representing the interests of those states, did not intend carefully to guard against a recurrence of similar evils ; and it seems to me to be a fair inference from the proceedings of the convention, that they supposed they had done so effectually by the adoption of the clauses in the constitution above referred to, and that they intended to confer full power upon congress to regulate the whole matter. It is reduced to a moral certainty, that the southern states would never have become members of the union upon any other condition. They knew full well the difficulties which had and

would grow out of the subject of slavery. They foresaw, with the spirit of prophecy, that unless some summary mode of reclaiming their fugitive slaves was adopted, all the slaves in the union would soon be emancipated, the owners *nolens volens.* They were fully aware of the unextinguishable prejudices of the north against domestic slavery; they were conscious that the descendants of the pilgrims viewed this species of vassalage with unutterable abhorrence, and that the progress of moral reform, of intelligence and of free principles, would strengthen the prejudices and increase the hostility of the non-slave-holding states. It would seem, therefore, that a portion of the convention had every motive which could possibly actuate men who were determined to protect and secure the enjoyment of their property, to effectually provide in the constitution for the accomplishment of that object : that object was supposed by them to have been effected, and the congress of the United States, which I believe was composed of some of the members of the convention, in the promotion of that object, passed the law which it is now insisted is unconstitutional. The members of the convention from the north and east undoubtedly entertained the same sentiments as the southern members, as to the powers conferred on congress ; especially as no doubt was entertained by any member of congress as to the constitutionality of the law in question at the time of its passage. The members of the convention from the non-slave-holding states yielded these positions in the spirit of compromise, which produced the final adoption of the constitution. They regarded the innumerable blessings resulting from our form of government as far outweighing the evils which were to be apprehended from slavery, or from the present mode of arresting fugitive slaves, which it must be confessed is somewhat summary. The proceeding before the magistrate is not, however, I apprehend, as contended on the argument, entirely of an *ex parte* character. The magistrate certainly has the right, and it probably would be his duty to examine any testimony produced on the part of the person alleged to be a slave, establishing his freedom ; and in a late case before the recorder of the city of New-York, witnesses

were introduced showing that an individual arrested as a fugitive slave was a freeman, and he was accordingly discharged.

Assuming the constitutionality of the law of congress, the next inquiry which naturally arises is, whether the law of this state, providing a different remedy for the removal of fugitive slaves, is ineffectual and void, or whether it can exist concurrent with the law of the United States. In the case of *Sturges* v. *Crowninshield*, 4 *Wheat*. 122, the supreme court of the United States lay down the doctrine, that "whenever the terms in which a power is granted to congress, or the nature of the power requires that it should be exercised exclusively by congress, the subject is as completely taken from the state legislature as if they had been expressly forbidden to act." It is difficult to conceive of any subject arising under the constitution, where it is more peculiarly proper that congress should have exclusive jurisdiction, than in the mode to be provided for the removal of fugitive slaves; or where the doctrine of the supreme court of the United States more aptly applies, " that when the nature of the power requires that it should be exercised exclusively by congress, state legislation must cease." What is the nature of the power contained in the constitution ? The nature and the spirit of it clearly is, as I have attempted to show, to secure to the slave-holding states a perfect control over, and right to remove their fugitive slaves by some summary and effectual process. And how, I would ask, is this object more simply and effectually to be accomplished than by a uniform mode to be established by congress, requiring the same proof and the same proceedings under it in every state in the union ? A slave-holder in Louisiana is as familiar with, or can as readily have access to the laws of the United States as to the laws of his own state ; he therefore comes prepared with the necessary proof to reclaim his fugitive slave in any part of the union. But if one of his slaves escapes to Vermont and another to New-Hampshire, and the doctrine is to be established that the slave is to be reclaimed according to the laws of those states, the owner leaves his residence wholly ignorant of the requisitions of the laws of those states, and finds on his arrival that his claim to his slave in one state is to be tried by a jury, and in the other by the judges of

the county courts ; *in the one* case to be established by the oath of one witness, in the other by the testimony of three witnesses; in short he would be subjected to all the machinery and trammels with which the prejudices and conflicting opinions of different state legislation might invest the whole subject. Is it not fair to presume that the owners of slaves, rather than to pass through such an ordeal, would abandon in despair the objects of their pursuit ? I think it is, and that legislation by the different state governments would indirectly lead to a total abolition of slavery. Believing, as I do, that the members of the convention anticipated similar results, I cannot arrive at the conclusion that it was ever designed that the state legislatures should exercise any control over the subject; but, on the contrary, that congress should possess exclusive jurisdiction as to the mode of reclaiming fugitive slaves, and that the very nature of the power conferred by the constitution requires, that congress should so exercise it. If these positions are correct, it necessarily follows that the law of this state must yield to the omnipotence of the law of congress.

It was contended on the argument of this cause, with great zeal and earnestness, that under the law of the United States a freeman might be dragged from his family and home into captivity. This is supposing an extreme case, as I believe it is not pretended that any such ever has occurred, or that any complaint of that character has ever been made ; at all events, I cannot regard it as a very potent argument. The same position might as well be taken in the case of a fugitive from justice. It might be assumed that he was an innocent man, and was entitled to be tried by a jury of the state where he was arrested, to ascertain whether he had violated the laws of the state from which he fled ; whereas the fact is, the executive of this state would feel bound to deliver up the most exalted individual in this state, (however well satisfied he might be of his innocence,) if a requisition was made upon him by the executive of another state. At best, this species of argument is begging the question ; for if the law of congress is constitutional, however unjust the law may be, or however severe in its consequences, the defect must be remedied upon the spot of its origin. It must be left to congress to establish a more salutary rule.

A question as to the *residence* of the complainant was raised upon the argument, and it was contended that inasmuch as it is admitted by the pleadings that the defendant in error is a *resident* of the state of New-York, that therefore she is incapable of holding slaves, at least of holding such of them in bondage who have fled to this state. I am well satisfied that the residence of the claimant is wholly immaterial. The only question is, whether the claimant is the owner of the person claimed to be a slave in a state where slavery is tolerated, and from whence the slave fled. A different rule would inevitably lead to the entire emancipation of all the slaves owned by individuals who are now residents of the slave-holding states; for it is easy to perceive that the natural inclinations of the slaves, aided by the untiring efforts now making both in and out of the slave-holding states, to excite them to insurrection, (under the pretence of ameliorating their condition,) would soon induce them to flee from their own state, to the place of residence of their owners. I venture to say that the idea never was entertained, either by the members of the convention who adopted the constitution, or the members of congress who passed the law authorizing the removal of fugitive slaves, that the removal of citizens from a slave-holding state to a free state would operate in this indirect manner as a manumission of their slaves. Several other questions of less importance were discussed upon the argument of this cause, which are worthy of examination; but I shall content myself with stating my acquiescence in the opinion expressed by the supreme court upon those points. I should have been better satisfied with the pleadings, if the statutes of Louisiana tolerating slavery, had been specially referred to; but I am nevertheless inclined to think that the rule requiring the statute of a state or country to be set forth, is not so extensive in its application as to require it in this case. That rule would seem to be confined to cases where a proceeding is predicated directly and particularly upon the effect of such statute. I am however of opinion that the general allegation of the existence of slavery is sufficient in this case.

I cannot refrain, in conclusion, from expressing my full belief, if the doctrine contended for by the plaintiff in error is to be regarded as the established law of the land, and consequently that all the states in the union are to be permitted to legislate upon this subject, requiring as many modes of proceeding in cases of this kind, as there are states, that it will in the end lead indirectly to the abolition of slavery, and that the most fearful consequences in regard to the permanency of our institutions will ensue. I regard this as but the entering wedge to other doctrines which are designed to extirpate slavery; and we may find when it is too late, that the patience of the south, however well founded upon principle, from repeated aggression will become exhausted. These considerations would have no influence with me if I could satisfy myself of the unconstitutionality of the law of congress; but I can never contribute in any manner, either directly or indirectly, to the abolition of slavery, however great an evil it may be, in violation of the constitution and laws of the country, and in violation of the solemn compact which was made by our forefathers at the adoption of the constitution, and which their posterity are bound to preserve inviolate. I am sustained in this view of the case by the whole current of authority, in all the states where the question has been decided. The whole doctrine was investigated in Massachusetts, in a case reported in *Pickering*, and presenting as strong a case as can be imagined. A slave belonging to a person in Virginia fled to the state of Massachusetts; he resided in that state five years, and in the meantime had accumulated a considerable property. It was nevertheless decided, upon solemn argument, that the law of the United States was constitutional; that the slave was not entitled to trial by jury, or by any other mode different from that prescribed by the law of congress; and he was accordingly taken back to Virginia. This was the unanimous opinion of the court. Mr. Justice Thatcher dissented, but not on the ground of the unconstitutionality of the law of congress. The same decision has been made in Pennsylvania, and also by Judge Thompson in a late case in the circuit court of the United States. In addition, if I may be permitted to refer to the decisions of the tribunals of this state, the distinguished

and learned individuals who preside over the supreme court of this state and the superior court of the city of New-York, upon mature deliberation, arrived at the same conclusion.

I cannot therefore consent to overturn a doctrine which is founded upon principle, and is sustained by authority; and am accordingly of opinion that the judgment of the supreme court ought to be affirmed.

Upon the question being put, *Shall this judgment be reversed?* the members of the court *unanimously* voted in the negative. Whereupon the judgment of the supreme court was AFFIRMED.*

---

* See note at commencement of case.