SUPREME COURT. At Chambers. October, 1846. Before *Edmonds*, Circuit Judge.

## In the matter of GEORGE KIRK, a fugitive slave.

A fugitive slave can be retaken and returned to service, only on the demand of his owner, or his agent or attorney.

The power of legislating on the subject of fugitives from service is exclusive in the government of the U. S., and it is not competent for state authorities to add to, or interfere with the subject.

The statute of the state of New York (1 *Rev. Stat.* 659, § 15), which allows the master or commander of a vessel, in case a slave shall have concealed himself on board his vessel and thus escaped to this state, to recapture such fugitive, and take him before the mayor or recorder, for the purpose of obtaining a warrant for his removal from the state, is repugnant to the constitution of the U. S., and therefore void.

On the 22d October, 1845, on a petition presented by Lewis Napoleon, setting forth that a colored boy, whose name was unknown, was closely confined on board the brig Mobile, lying at the foot of Maiden Lane, and bound in chains, the circuit judge allowed a writ of habeas corpus, returnable forthwith in the oyer and terminer then sitting; which was duly served, and the boy brought before the court, when the following return was made to the writ:

I, Theodore Buckley, master of the brig Mobile, do return to the annexed writ of habeas corpus, that a colored man calling himself *George*, the person now present, at the time of the service of said writ was under my restraint, and that I claim to hold him under my restraint, as a fugitive from service in the state of Georgia, under and by virtue of the laws of which state he is held to labor and service as the slave of Charles Chapman, of Bryan county, in said state of Georgia.

And I do further return, that said George covertly and *privately, against my knowledge and consent, with a view to effect his escape from the service to which he was lawfully held, under and by virtue of the laws of the state of Georgia, secreted and concealed himself on board the brig Mobile, of which I am*

*master, while lying at the port of Savannah, in the said state of Georgia; that said vessel sailed from said port on the thirteenth of October instant for the port of New York, without any knowledge on my part of the concealment on board said vessel of said George; that while on the high seas on her said passage, in latitude 34 deg. 10 m. N., longitude 75 deg. W.,* the said vessel being at the time without the jurisdiction of the state of Georgia, to wit, on the fifteenth day of October, one thousand eight hundred and forty-six, the said George was discovered concealed in the fore steerage of said vessel, covered with a sail; and, on being questioned, admitted that he was the slave of the aforenamed Charles Chapman, and that he had secreted himself on board of said vessel with a view to effect his escape from the service to which he was lawfully held, under and by virtue of the laws of said state of Georgia, as the slave of the said Charles Chapman.

I do further return, that the state of Georgia is an independent and sovereign state, having full power and authority to govern and regulate all matters of internal social polity of said state, not by the terms or spirit of the federal compact surrendered to the government of the United States; that, for more than one hundred and fifty years past, the said state of Georgia, as a colony of Great Britain, and in connection with her sister colonies, by her declaration of independence as a sovereign state, has continually and without interruption held and possessed a certain internal domestic institution called slavery; that the existence of such institution has been from time to time, by competent authority, recognized as a right reserved and secured to said state, and within the spirit, meaning and guaranties of the said federal compact; that the said institution was authorized and provided for by the laws of Great Britain, whereof the first settlers and the colonists of said Georgia were and always continued to be loyal subjects, until the year one thousand seven hundred and seventy-six, when the said colonists, by an overt act, declared themselves to be, in common with the inhabitants of divers other colonies and provinces, free and independent of the said government of Great Britain,

In the matter of George Kirk.

that the said colonists did not, in consequence of said declaration of independence, in fact or in design, remit or relinquish their right to regulate and govern their own internal affairs and social polity; but, on the contrary, did thereby design and intend more fully and freely to assert and maintain said rights.

That in and by the said institution so held, possessed and enjoyed by the said state by long usage and of right, and under the paramount law of the land—that is to say, under the constitution and laws of the United States—certain persons, of whom the said George is one, have been and are held to labor and service within the said state of Georgia, and are held and owned as property, and protected and guarded by the laws of said state, and the happiness and well-being of said persons are secured by said laws.

That, nevertheless, for many years last past, divers malicious and evil disposed persons, residents of other states, regardless of the laws of the land, and treating with contempt the constitutional and rightful exponents of said laws, have assailed said institution, and have sought by fraud, violence, and other devices known to the wicked, wrongfully and seditiously to cause insurrections among those persons, and thereby to cause the citizens of said state of Georgia to be exposed to robbery, assassination and general anarchy; and although these evil designs and attempts have hitherto been hindered and checked by the firmness and loyalty of the national government of the United States, yet the said evil disposed persons have organized, and in many instances have executed, a system of robbery; and, in disregard of the word of God denouncing such doings, have feloniously abducted and carried away, and encouraged the escape of divers such persons from the possession of their lawful owners. That the said state of Georgia, in discharge of its political duty as a government of and for the people of said state, has, under the constitution of the United States, from time to time passed and enacted various laws to the end that the people of said state should be protected against the wicked acts and designs of such evil disposed persons, and that the property of the good people of said state should be protected

and preserved to the said citizens under the law of the land, and in and by which said laws it is, among other things, enacted as follows:

§ 24. " It shall and may be lawful for every person to take, apprehend and secure any runaway or fugitive slave; and they are hereby directed and required, within forty-eight hours after such taking, apprehending and securing (otherwise such person to be construed and taken as a harborer of such runaway or fugitive slave), to send such slave, if convenient, to the master or other person having the care and government of such slave, if the person taking up or securing such slave knows, or can without difficulty be informed, to whom such slave belongs."

§ 34. " If any person shall conceal, harbor, hide, or cause to be concealed, harbored or hidden, any slave or slaves to the injury of the owner or owners thereof, such persons so offending shall, on conviction, be sentenced to be imprisoned in the penitentiary, at hard labor, for any period of time not exceeding two years. Provided, nevertheless, that on the trial for this offence, the person charged with it shall be acquitted if he or she had an apparent well founded claim to the slave or slaves so harbored and concealed; and on every conviction for concealing or harboring a slave or slaves, the owner or owners of such slave or slaves may recover damages by civil suit for the loss of the labor and services of such slave or slaves, notwithstanding the said conviction."

§ 35. " If any person shall remove and carry or cause to be removed and carried away out of this state any slave or slaves, or out of the county where such slave or slaves may be, without the consent of the owner or owners of said slave or slaves, any person so offending shall, on conviction, be sentenced to undergo an imprisonment in the penitentiary, at hard labor, for any period of time not exceeding seven years."

I do further return, that Charles Chapman, of Bryan county, state of Georgia, is interested in the detention of said George.

THEODORE BUCKLEY.

*Sworn in open court, this 23d day of October, 1846.*

In the matter of George Kirk.

HENRY VANDERVOORT, *Clerk of Oyer and Terminer.*

*J. Bowditch Blunt,* of Counsel.

To this return, Mr. *John Jay,* for the prisoner, interposed a general demurrer, and Mr. Blunt joined.

*John Jay* and *J. White,* for the demurrer, made the following points:

I. The common law of all nonslaveholding states is, that foreign slaves are no longer such after their removal into a nonslaveholding state (*Somerset's Case,* 20 *How. St. Tr.* 79; *Story's Con. Laws, p.* 92, *and Cases*; *Forbes* v. *Cochran,* 2 *B. and Cr.* 448).

II. The question, therefore, first presented is, how far is the operation of this common law abridged by the constitution and laws of the *United States?*

The constitution provides, " no person held to service or labor in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, *but shall be delivered up* ON THE CLAIM OF THE PARTY to whom such service or labor may be due (*Art.* 4, *sec.* 2, *sub.* 3).

The law of congress authorizes the owner, his *agent or attorney,* to seize the fugitive, take him before a judge or magistrate, and upon *proof,* oral or by affidavit, of the service due, it shall be the duty of the judge, &c., to grant a warrant to the party or agent to remove (*Story's Laws U. S. vol.* 1, *p.* 285, 12 *Feb.* 93).

III. The judge must be satisfied from the " proof " of three things: 1st. That by the laws of Georgia the negro is held to service or labor; 2d. That the person to whom the service or labor is due, desires to reclaim the fugitive; 3d. That the negro is a fugitive.

IV. Neither of these three things are shown, because, 1st. The allegation is (in the return), that by the laws of Georgia the negro is held to labor *as a slave.* Foreign laws can not be

proven in this way; 2d. There is no allegation that the negro *is* a slave—no terms of servitude set forth; 3d. The claim made is in derogation of the natural right of the negro, and must be clearly proven; 4th. It does not appear that the negro left *without the consent of the owner;* 5th. He is not claimed by *Chapman, or by his agent or attorney.*

V. Concede, therefore, that the negro was the property of Chapman; the defendant has no right, in fact, to the custody, because, 1st. He shows no authority to act for Chapman; 2nd. He claims no interest in the negro.

The right to the service is a personal right, given by positive municipal law; and the court and a stranger can not exercise or claim it, because excluded both by the constitution and the law of 1793.

VI. Neither has the defendant the right to the custody by the federal law or court, by the law of this state or of Georgia.

1st. He can not claim under the first, because he is neither owner, agent or attorney; 2nd. Nor under the second, because our law does not recognize the institution of slavery, except under the compulsion of federal legislation and the federal constitution. Beyond their actual and positive requirements, it knows no slave and no slavery: 3d. The third gives no right here, because the laws of Georgia were designed to operate upon the citizens of Georgia within the jurisdiction of Georgia. Beyond the limits of the state they have no binding obligation; 4th. Our courts administer foreign laws *ex comitate*—but such law has no force here *ex proprio vigore,* nor will it be administered if violative of justice, *natural right, morality, or settled policy;* as the law of Georgia is violative of each and all, it will not be administered.

VII. The negro when discovered was without the *jurisdiction of Georgia, and every other state of the Union.* The respondent could not, therefore, have arrested him by virtue of the law of Georgia. He was beyond its operation. Nor by any law of the federal government, *for there is* none. The defendant was guilty, therefore, *of a trespass,* and his claim to the custody of the negro is founded in *tort.*

In the matter of George Kirk.

VIII. If the defendant is the agent of Chapman, he must be the general agent, as no special agency for the purpose of this reclamation is shown.

If this be so, then, as he voluntarily brought the negro to this port, it was the act of the principal, and the negro was *ipso facto* free (*Commonwealth* v. *Aver*, 18 *Pick.* 143).

But no agency is shown, and none will be presumed, as the law of this state has no intendments against human liberty.

Mr. *Blunt*, in reply, insisted,

1. That the respondent is, under the laws of Georgia, the agent of the master of the slave; and under the constitution of the United States and the laws of congress, has a right to retake him and return him to Georgia.

2. That under the state statute (1 *Rev. Stat.* 659, § 15), the respondent has a right to the custody of the boy, in order to take him before the mayor or recorder, to the end that he may obtain a certificate to warrant his returning him to the state of Georgia.

On the 27th October, Judge Edmonds delivered the opinion of a majority of the court.

By the United States constitution, art. 4, § 2, a fugitive from service can be claimed only by the party to whom the service is due.

By the act of 1793 (1 *Story Laws of U. S.* 285), in case of the escape of a person held to labor, the person to whom such service may be due, his agent or attorney is empowered to seize or arrest such fugitive and take him before a proper officer, to the end that a warrant may be obtained for removing him to the state from which he had fled.

As I read and understand this statute, it clearly contemplates that the right to reclaim a fugitive slave shall not be exercised except by due process of law, and never *vi et armis.* Such, at least, was the contemporaneous interpretation by congress of this provision in the constitution, and would forbid to the owner — and if to him, then surely to his agent or attorney —

the right by strong hand, by fastened hatches, blows and hand-cuffs, to enforce a reclamation. And such a construction seemed to me most consonant with the principle of our institutions, which forbids that any one shall be deprived of life, liberty or property, except by due course of law.

The Supreme Court of the United States, however, seems, in the case of *Prigg* v. *Com. of Penn.* (16 *Peters*, 539), to have intimated a different opinion, though as that point was not necessarily before them, and as the question submitted to them by consent was the constitutionality of a law of Pennsylvania, and the power of its legislature to pass any law upon the subject, it may well be doubted whether their remarks were not *obiter dicta*. But if they are otherwise — if pertinent and decisive, they are still carefully guarded with the qualification, that the party may " claim and retake his wife, child or servant, wherever he happens to find them, so it be not in a riotous manner or attended with a breach of the peace," " and the owner may seize and recapture his slave whenever he can do it without any breach of the peace or any illegal violence."

The general language of the return in this case, and the right assumed under it, might justify the resort to illegal violence in seizing and retaking the slave. The right to retake him or to hold him in durance, is in the return founded on the asserted fact that he is a fugitive from service in the state of Georgia, under and by virtue of the laws of which state he is held to labor and service as the slave of Charles Chapman, of Bryan county " in said state," and the fact that he had concealed himself on board the vessel for the purpose of escaping from such servitude. If this fact alone, without qualification without any averment that the restraint was without illegal violence, would justify this restraint, then they would of necessity justify restraint in a riotous manner or by a breach of the peace.

That could not be defended in the owner, and of course not in his agent or attorney.

If it were otherwise, the master of the vessel, in this case, would be justified in holding the slave, at the point of the bay-onet, with closed hatches and with chains.

In the matter of George Kirk.

But it is unnecessary to dwell upon this consideration, for the master of the vessel can not justly be regarded as the agent or attorney of the owner. It is not pretended that he has any express authority from the owner. The facts of the return preclude the idea. It is contended that the authority is implied from the laws of Georgia.

To this claim there are several very conclusive answers.

1. The laws of Georgia do not operate beyond her territory. From the first moment that the respondent discovered the boy on board his vessel and began the exercise of his control over him, until the present time, he has been without the jurisdiction of Georgia, beyond her territory, and beyond the operation of her laws. And to allow this claim would be in effect to call upon the magistrates of this state, within our territory, to execute the laws of Georgia, not to enforce a right which had become perfect within the territory, but one that had no beginning even till her boundaries had been passed. I am not aware that the obligation of one state to give full faith and credit to the public acts, records, and judicial proceedings of every other state, has ever been carried to that extent. How can it be without subjecting the territory of every state to the jurisdiction of at least twenty-seven independent sovereignties?

2. The laws of Georgia do not of themselves contemplate any such agency. It is true that by those laws any person may apprehend a fugitive slave and return him to his master. But this confers no special authority upon the respondent to the exclusion of every body else. "Every person" may do it, and how can it be said that this makes him more than any other person the owner's agent? Every person may just as well be such agent as the respondent.

But that statute in its very terms is intended to operate within the territory of Georgia, and not beyond it. Or why the provision that within forty-eight hours after the apprehension, the slave shall be sent back to his master? If the manucaptor in Maine should detain him forty-eight hours, forty-eight months or forty-eight years, could the jurisdiction of Georgia reach him with its penal inflictions? Why the provision that he who

harbors the slave shall be confined in the penitentiary? Could a citizen of New York be condemned to the penitentiary of Georgia for harboring the slave in New York?

It is evident that the statute was calculated only to operate within the territory of Georgia, and the sovereign authority of that state would doubtless be not a little surprised to learn that so wide a range of authority was claimed for its enactments.

Numerous difficulties would spring from the establishment of the principle contended for. Though in this case there is no reason to apprehend that aught would be done that conscience and the law would not sanction, yet it is worth while to consider the effect of the decision in case it should be drawn into a precedent.

How long may the master of a vessel, under such circumstances, detain the slave within our borders? Days, months, or years? What security is to be afforded that the slave will be returned to the person entitled to his service, and not be sold elsewhere in bondage? What is there to prevent our own free citizens from being carried away into slavery? Our protection would be very imperfect, if the law should be so established.

As then the respondent can not with propriety be regarded as the agent of the owner, and as such owner does not present a claim to the services of this boy, either by himself or by his agent or attorney, the prisoner can not be held, under the constitution or laws of the United States, as a fugitive from service, and must be discharged, unless he can be held under the laws of our own state.

Our Rev. Stat. (1 *R. S.* 659, §15), contain a provision that whenever a person of color, owing service in another state, shall secrete himself on board a vessel and be brought into this state in such vessel, the captain may seize him and take him before the mayor, &c., who may inquire into the circumstances and give a certificate, which shall be a sufficient warrant to the captain to carry or send such person of color to the port or place from which he was brought. And on the argument, it was suggested that, *non constat,* the respondent

In the matter of George Kirk.

held him in custody for the purpose of taking him before an officer under such statute.

It has been well questioned on the argument, whether our legislature had any authority to enact such a statute.

In *Prigg's case* ( 16 *Pet.* 617 ), Story, J., says, the legislation of congress, if constitutional, must supersede all state legislation upon the same subject, and by necessary implication prohibit it. For if congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it can not be that the states have a right to interfere.

In *Houston* v. *Moore* (5 *Wheat.* 1), it is expressly held, that where congress have exercised a power over a subject given them by the constitution, it is not competent for state legislation to add to the provisions of congress.

In *Prigg's case* ( 16 *Pet.* ), the court held that the power of legislation on the subject is exclusive in the national government, and cite with approbation the language of Chief Justice Marshall in *Sturgiss* v. *Crowninshield* (4 *Wheat.*). " Wherever the terms in which a power is granted to congress, or the nature of the power require that it should be exclusively exercised by congress, the subject is as completely taken from the state legislatures as if they had been forbidden to act."

And after discussing the evils that might arise from state interference, conclude, surely such a state of things never could have been intended under such a solemn guarantee of right and duty.

The nature and objects of the provisions imperiously require, that to make it effectual it should be exclusive of state authority.

But still the police power is left to the states, so that the rights of the owners be in no just sense interfered with.

And whether the provisions of our revised statutes are constitutional or not, depends upon this question — whether it was intended, and would necessarily operate, merely to advance and enforce the rights of the owner, or to secure the state from the depredation and evil example of the fugitive ? If the former, the statute can not be sustained. Yet in this case it is

invoked solely for the benefit of the owner, and the statute provides not that the fugitive shall be removed from our territory — which would be all that would be necessary if our own welfare alone was consulted — but that he shall be delivered up to the master of the vessel, to the end that he may be carried back to the port from which he was brought.

The constitutionality of this provision of our revised statutes may, therefore, well be questioned.

But it is not necessary to decide that point. It is enough that it is no where in the return alleged that the respondent claims, or did claim, to hold the slave for any such purpose. The claim, as has already been stated, is founded solely on the fact that George is a slave; and that fact is set forth in the return in such general terms, that at one moment it is urged as sufficient to justify a claim to hold him as the agent of the owner, and at another as the captain of the vessel; at one instant as justified by a well defined provision of our national constitution, and at another by a doubtful local statute.

The fact set out in the return does indeed support the one claim as well as the other. But that circumstance of itself shows that the averment is too defective to be available under either aspect. Besides, the fact would justify a still broader claim, that, namely, of any person who should please, within our territory, to arrest him as a fugitive from service.

If the respondent was in fact holding the boy in pursuance of this statute, and for the purpose of taking him before the mayor, that his liability in servitude might be adjudicated upon, he ought so to have averred on his return, and this, not merely as a matter of form, but as matter of substance, that the prisoner might have taken issue upon it.

To seize him and take him before the mayor, &c., would require a very brief period of time; yet, consistently with the truth of the return, he may have been detained for days after his seizure and after his arrival in this port. If, on an issue joined, such should appear to be the fact, any court or jury might — nay, would be bound in common fairness to declare, that he had not been held for any such purpose.

In the matter of George Kirk.

In   case involving personal liberty, where the fact is left in such obscurity that it can be helped out only by intendments, the well established rule of law requires that intendment shall be in favor of the prisoner.

We have not in the return any thing to warrant the idea that the respondent was holding the slave for the purpose of taking him before the mayor, under the statute, except the facts that he was a slave, that he had concealed himself on board the vessel and was there held in durance.

And those facts would just as well warrant the idea that he held him as the agent of the owner, under the laws of the United States, or held him for the purpose of selling him into bondage elsewhere.

This claim, resting as it does on a doubtful statute, and unsupported by the facts, must also fall to the ground.   And the respondent is left before us to be regarded as one having no authority in the matter, but as preferring a claim to the custody of this boy, simply because he has admitted himself to have been a slave.

To allow the claim in this case, would justify his being surrendered to any other stranger who might demand him, in order to transport him into closer and more enduring bondage, or to conceal him beyond the reach of his lawful master.

The court then instructed the clerk to enter an order on the minutes, directing the slave to be discharged.

On the same day, Mr. *Jay* presented a petition to the circuit judge, setting forth that after the discharge of the slave by the oyer and terminer, he had been seized by the authority of the master of the vessel and taken before the mayor, for the purpose of obtaining the certificate under the Rev. Stat. to warrant his reconveying him to Savannah — and praying the allowance of a writ of habeas corpus, directed to the mayor, who held him in custody, for the purpose of inquiring into the propriety of granting a certificate.

To this second writ the following return was made

*To the Honorable* JOHN W. EDMONDS, *Circuit Judge for the first judicial circuit of the state of New-York:*

The return of Andrew H. Mickle, mayor of the city of New-York, to the writ of habeas corpus directed to him, and allowed by the circuit judge above named, on the twenty-seventh day of October, A. D. 1846, to inquire into the cause of the detention of a colored boy named George Kirk — shows :

That on the same twenty-seventh day of October, A. D. 1846, the application in writing, whereof a true copy is hereunto annexed, was made to the said Andrew H. Mickle as mayor of the said city of New-York, by Theodore Buckley, in said application mentioned, setting forth that he, the said Buckley, was master of the brig " Mobile," an American vessel, belonging to the port of New-York. That on the thirteenth day of October instant the said vessel sailed from the port of Savannah, in Georgia, bound for the port of New-York. That on the fifteenth day of October instant, in latitude 34 deg. 10 m., N., and longitude 75 deg., W., the said Buckley discovered a colored man secreted in the foresteerage of said brig covered with a sail. That upon examination of said negro, he admitted that he was the slave of Charles Chapman, of Bryan county in the state of Georgia, and that he had secreted himself on board of the said brig while lying at the port of Savannah, in said state of Georgia, with a view to escape from the service to which he was lawfully held under the laws of said state.

The said application farther set forth, that the said Buckley arrived at the wharf in the port of New-York, with said colored man on board, on the 22d day of October instant, and that said colored man was taken on that day from the custody of said Buckley by a writ of habeas corpus, and at the time of presenting such application was in the city prison.

The said application farther set forth, that said colored man did secrete himself on board of said brig Mobile, while lying at the port of Savannah aforesaid, without the knowledge or consent of the said Buckley, the master and commander of such brig, and that by so doing he subjected the said Buckley to the

In the matter of George Kirk.

penalties of fine and imprisonment under the laws of Georgia; wherefore the said Buckley prayed that a certificate might be furnished to the said Buckley, to carry or send such colored person to the port of Savannah aforesaid.

That the said Buckley duly verified, by his oath before the said mayor, the said application.

That in the afternoon of the same twenty-seventh day of October, A. D. 1846, the said colored boy named George Kirk, was brought before the said mayor, at his office in the city hall of the city of New-York, by the said Buckley and persons by him authorized to aid and assist him as his agents in that behalf. That there appeared before the said mayor, at the said time and place, Nathaniel B. Blunt, esquire, counsel for the said Buckley, and John Jay, esquire, counsel for the said colored boy. That thereupon the said mayor, at the request of the said Buckley, and in discharge of the duty imposed upon him in that behalf by the laws of the state of New-York, was about to proceed, in conformity with the law, to inquire into the circumstances stated in the application aforesaid, for the purpose of determining judicially under the law whether the certificate applied for should be given as authorized by the law, when it was agreed by and between the parties to the said proceeding and their counsel, that the inquiry should be postponed until the hour of six o'clock in the afternoon of the same twenty-seventh day of October, A. D. 1846, and that until such hour the said colored boy should remain in the charge and under the control of the said mayor and be detained by him. That this latter arrangement was assented to by the parties and their counsel.

That the said mayor thereupon took the charge and control of the person of the said colored boy, and before the hour appointed for the inquiry aforesaid, there was served upon the said mayor the writ of habeas corpus hereunto annexed, and to which this is a return.

And the said Andrew H. Mickle insists, that by reason of the facts hereinbefore stated, it is his duty, under the law, to make the inquiry aforesaid, in the exercise of an authority

judicial in its nature; and that, for the purpose of such inquiry and until the termination thereof, he is entitled to have the said colored boy before him and subject to his orders, and that the said boy is now in the charge and under the control of said mayor.

But whether, on the foregoing facts, the said colored boy is subject to any order of the circuit judge, by whom the said annexed writ of habeas corpus was issued, the said mayor submits to the decision of the said judge.

In witness whereof the said mayor hath hereunto subscribed his name, this twenty-eighth day of October, A. D. 1846.

A. H. Mickle, <em>Mayor.</em>

*State of New-York, city and county of New-York,* ss.

Theodore Buckley being duly sworn deposeth and saith, that he is the master of the brig Mobile, an American vessel, belonging to the port of New-York. That on the thirteenth day of October instant the said vessel sailed from the port of Savannah, state of Georgia, bound for the port of New-York; that on the fifteenth of October instant, in latitude 34 deg. 10 m., N., and longitude 75 deg., W., this deponent discovered a colored man secreted in the foresteerage of said brig, covered with a sail. That on examination of the said negro, he admitted that he was the slave of Charles Chapman, of Bryan county, state of Georgia, and that he had secreted himself on board of said brig, while lying at the port of Savannah, in said state of Georgia, with a view to escape from the service to which he was lawfully held under the laws of said state.

And deponent further saith that he arrived at the wharf in the port of New-York with said colored man on board, on the 22d day of October instant, and that said colored man was taken on that day from the custody of deponent by a writ of habeas corpus, and is now in the city prison.

And deponent further says, that said colored man did secrete himself on board of the said brig Mobile, while lying at the port of Savannah, in the said state of Georgia, without the knowledge or consent of this deponent, the master and com-

In the matter of George Kirk.

mander of the said vessel; and that by so doing he subjected this deponent, under the laws of Georgia, to the penalty of fine and imprisonment; wherefore deponent prays that the certificate may be furnished to this deponent to carry or send such colored person to the port from which he was brought.

And further says not.

(Signed)                                   THEODORE BUCKLEY.

Sworn to before me, this 27th day of October, 1846.

(Signed)                                   A. H. MICKLE, *Mayor.*

To this return a general demurrer was interposed, and a joinder in demurrer.

The demurrer was argued before the circuit judge by *Mr. Jay* and *Mr. White* as counsel for the petitioner, and by *Mr. McKeon* (district attorney), on the same side, and by *Mr. Blunt* as counsel for the master, and *Mr. J. T. Brady* as counsel for the mayor.

The points taken were,

1. That the provision of the Rev. Stat. under which the proceedings before the mayor had been instituted, had been repealed by the act of 1840.

2. That, if not repealed, the statute was void, as repugnant to the constitution of the United States, which conferred the power of legislation on this subject exclusively upon congress.

EDMONDS, *Circuit Judge.*—When this boy was before me on a former occasion, no principle of law was involved, but mainly a question of fact, arising out of the return. On the present occasion it is quite otherwise. The question now presented is, the constitutionality and consequently the validity of a statute of our state.

It is not from any choice on my part, that I am called upon to consider this question. If my wishes had been consulted, the case would have remained with the mayor, until he had decided it; and even then, I should have been much better pleased, if the review of his decision had been committed to some functionary whose other duties would have allowed him more lei-

sure than I can command to examine it. But the party had a right to bring the matter at once before me; under our statute, I was bound to allow the writ of *habeas corpus*, even if I had been fully convinced of the legality of the imprisonment; and the return made to the writ, necessarily raising the question to which I have alluded, it becomes my duty to consider and decide it—a duty from which I am not at liberty to shrink, and which I hope I may be able to discharge, without partaking of the excitement which has surrounded the question from the beginning.

It is conceded on the record that George is a slave, owing service to a master in Georgia; that without the consent of his owner, and without the knowledge of the officers or owners of the vessel, he concealed himself on board the brig Mobile, in the port of Savannah, for the purpose of securing a passage to New York; that his being on board was not discovered by the officers of the brig until they had been at sea two days on their return voyage, and had got without the territory of Georgia; that as soon as he was discovered, he was arrested and confined until his arrival in this port, and that on his arrival, the master of the vessel took him before the mayor, to the end that he might obtain from the mayor a certificate which shall warrant him in returning the boy to the port of Savannah; that the owner of the slave does not demand him under the constitution and laws of the United States, but he is demanded by the claimant, simply by virtue of his station as master of the vessel, and by virtue of a provision of our statutes.

Such are the facts of this case. The law applicable to it, is to be found in § 15, 1 *Rev. Stat.* 659, which enacts that whenever any person of color, owing labor or service in any other part of the U. States, shall secrete himself on board of a vessel lying in any port or harbor of such state, and shall be brought into this state in such vessel, the captain or commander thereof may seize such person of color and take him before the mayor or recorder of the city of New York. The officer before whom such person shall be brought, shall inquire into the circumstances, and if it appear, upon proper testimony, that such per-

In the matter of George Kirk.

son of color owes service or labor in any other state, and that he did secrete himself on board of such vessel without the knowledge or consent of the captain or commander thereof, and that by so doing he subjected such captain to any penalty, such officer shall furnish a certificate thereof to such captain or commander, which shall be a sufficient warrant to him to carry or send such person of color to the port or place from which he was so brought as aforesaid.

It must constantly be borne in mind that the question before me does not grow out of, nor is it in any way connected with an attempt on the part of the owner of the slave to enforce his rights under the constitution of the United States and the law of congress of 1793, but arises solely out of a state statute, which authorizes another person, in no respect connected with the owner of the slave, nor acting by his authority, to retransport him from our territory to the place where he had been held in bondage, and where again he may be returned to bondage.

In other words, while the constitution of the United States gives to the party to whom the service or the labor may be due, the right to reclaim his servant, and the law of congress extends that right to the agent or attorney of such party, it is claimed that the state legislature has a right to interpose and extend the right to a third person, not acting for or by authority of the owner, but merely because he was the commander of a vessel on which the slave may have concealed himself, and because by such concealment, the commander may have become liable to a penalty.

Such is the authority which the mayor has been called upon to exercise, and which it is insisted has not been, and can not be conferred upon him by the state legislature.

Two objections are raised to this claim of authority:

1. That the provision of the revised statutes authorizing the proceeding has been virtually repealed by an act of our legislature, passed in 1840.

2. That if it has not been repealed, it is repugnant to the constitution of the United States, and therefore inoperative and void.

In the matter of George Kirk.

The conclusion to which I have arrived on this point renders an examination of the first unnecessary.

The section of the revised statutes under consideration is part of title VII of chap. 20, of the first part, which is entitled, "Of the importation into this state of persons held in slavery, of their exportation, of their services, and prohibiting their sale;" and is a revision of the act of 1817, entitled " An Act relative to slaves and servants."

The 30th section of the act of 1817, which contains the provision which has been incorporated into this 15th section of the revised statutes, is preceded by a recital that " whereas persons of color owing service or labor in other states, sometimes secrete themselves on board of vessels while such vessels are lying in the ports or harbors of other states, and thereby subject the commanders thereof to heavy fines and penalties." And it is worthy of observation, that the act of 1817 as well as this title of the revised statutes, aims at prohibiting the exportation as well as the importation of slaves, and that while the act of 1817 abolishes slavery after the 4th of July, 1827, the revised statutes declare that every person born in this state shall be free, and every person brought into this state as a slave, except as authorized by this title, shall be free.

It may well be questioned whether, as this slave was brought into this state in a manner not authorized by the revised statutes, he did not thereby, under our law, become *ipso facto*, free, and whether this proceeding before the mayor is not, therefore, in effect, a proceeding to carry a free citizen into bondage But I do not consider that point, as it was not raised before me in the argument, was not discussed, and is not necessary to the decision of the question before me.

The broad question discussed, and which I am called upon to decide is, whether our state legislature have authority to pass this law.

The point has never, as far as I can learn, been decided, or even agitated in our state, and it is presented to me not only as a new one, but in the imposing form of requiring from me a decision that a law of our state is repugnant to the constitution

In the matter of George Kirk.

of the United States, and therefore void. Fully aware of the diffidence with which courts should always entertain such questions, I approach this with all the caution becoming the gravity of the case, yet with a lively sense of what is due to personal liberty and the fraternal relations existing among the members of the Union.

As I have already mentioned, the statute under consideration was first enacted in 1817, and was subsequently re-enacted and went into effect as part of the revised statutes, in 1830.   In 1834, the supreme court of this state, in *Jack* v. *Martin* ( 12 *Wend.* 311), held that the law of congress, in regard to fugitive slaves, was supreme and paramount from necessity; that so far as the states are concerned, the power, when thus exercised, is exhausted, and though the states might have desired a different legislation on the subject, they can not amend, qualify, or in any manner alter it; that though the act of the state might not be in direct repugnance to the legislation of congress, it does not follow that it is not in legal effect; that if they correspond in every respect, then the latter is idle and inoperative; if they differ, they must, in the nature of things, oppose each other so far as they do differ; that a fair interpretation of the terms in which the provision of the constitution is expressed, prohibits the states from legislating upon the question involving the owner's right to this species of labor; and that while the law of congress, thus passed, exists, the power of the states is suspended, and, for the time, is as inoperative as if it had never existed.

The case of *Jack* v. *Martin,* was carried to our court for the correction of errors and the judgment of the supreme court was affirmed.   Though the reasons given for the decision in the court of last resort, as reported in 14 *Wend.* 507, differ from those given in the court below, the positions of the supreme court, as I have extracted them, were in no respect disturbed, but have ever since remained, and are now the law of the land, governing the courts and citizens of this state.

In 1842, the supreme court of the United States, in *Prigg* v. *Pennsylvania* ( 16 *Peters,* 539), had the same question before

them. It arose out of various statutes which that state as well as New York and other northern states had from time to time been enacting on the subject of slavery, and which contained, among other things, provisions very like ours in regard to slaves who had absconded from other states

*Story*, J., in delivering the opinion of the court, declares that the law of congress may be truly said to cover the whole ground of the constitution, not because it exhausts the remedies which may be applied, but because it points out fully all the modes of attaining the object which congress have as yet deemed expedient or proper to meet the exigencies of the constitution. And he adds:

If this be so, then it would seem upon just principles of construction that the legislation of congress must supersede all state legislation upon the same subject, and, by necessary implication, prohibit it. For, if congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner and in a certain form, it can not be that the state legislatures have a right to interfere, and, as it were by way of compliment to the legislation of congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such a case the legislation of congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject matter. This doctrine was fully recognized by the court in *Houston* v. *Moore* (5 *Wheat.* 1), where it was expressly held that where congress have exercised a power over a particular subject given them by the constitution, it is not competent for state legislation to add to the provisions of congress upon that subject.

This is the supreme law of the land, which I am bound to obey, and is applicable to the case before me in this aspect, that while congress, in the exercise of its constitutional power over fugitives from service, has given the right to retake and reconvey them to the place of service, to the party to whom the service is due, his agent or attorney, the state legislation adds to the provision of congress on that subject, by conferring the

In the matter of George Kirk.

power of recapture and reconveyance upon the commander of a vessel on board of which the fugitive may have concealed himself.

If it may add, may it not diminish? And if state legislation once begins, where is it to end, and what bounds are to be set to it, but state discretion? Well, indeed, did our supreme court repudiate the idea that the framers of the constitution intended to leave the regulation of this subject to the states, when the provision itself obviously sprung out of their fears of partial and unjust legislation by the states in respect to it.

While this construction of the constitution—though recent in its promulgation, yet old as the instrument itself—was conceded on all hands during the argument before me, it was contended that our statute did not fall within its destroying influence, because it was only a police regulation, and therefore legitimately within the scope of state authority.

In 16 *Peters*, 625, *Story*, J., qualifies the decision of the supreme court of the United States, by saying that they were not to be understood in any manner to doubt or interfere with the police power belonging to the states, in virtue of their general sovereignty. That police power extends over all subjects within the territorial limits of the states, and is distinguishable from the right and duty secured by the provision of the constitution under consideration.

It becomes, therefore, material to inquire what is the police power here alluded to, and does our statute justly and properly fall within its scope ?

In 16 *Peters*, the same learned judge speaks of this power as conferring full jurisdiction on the states to arrest and restrain runaway slaves, and remove them from their borders and otherwise to secure themselves against their depredations and evil example, as they certainly may do in cases of idlers, vagabonds and paupers. The rights of the owners of fugitive slaves are in no just sense interfered with or regulated by such a course; and in many cases the operations of this police power, although designed essentially for other purposes, for the protection, safety and peace of the state, may essentially pro-

mote and aid the interests of the owners. But such regulations can never be permitted to interfere with or obstruct the just rights of the owner to reclaim his slave, or with the remedies prescribed by congress to aid and enforce the same.

In *New-York* v. *Milne* (2 *Peters*, 139), Mr. Justice *Barbour*, in delivering the opinion of the court, applies this test to determine the nature of the power: Did it belong to the state before the adoption of the constitution ? has it been taken from the states and given to congress? or does it fall within that immense mass of legislation which embraces every thing *within the territory* of a state not surrendered to the general government ? And the power then under consideration was held to be of that "mass," because its place of operation was within the territory, and therefore within the jurisdiction of the state; because the person on whom it operates was found within the same territory and jurisdiction; because the persons for whose benefit it was passed were the people of the state; because the purpose to be attained was to secure the protection of that people, and because the means used were just, natural and appropriate to those ends.

Complaint was made during the argument, that this police power was exceedingly vague, uncertain and undefinable, and hence, I suppose, an inference was to be deduced that I ought to regard the claim of power with little favor at least. In the very nature of things it must be difficult, in few, or perhaps in many words, to define the power; for it comprehends an immense mass of legislation, inspection laws, quarantine laws, health laws, internal commerce, roads, ferries, &c.

Yet, immense as is this mass, and various as are the interests embraced in and affected by it, it seems to me that the rules laid down by the Supreme Court of the United States, as I have already quoted them, and the tests which they provide, are plain and simple and easy to be understood, and in their application to this case entirely decisive and satisfactory in the result to which they lead us.

To apply, first, the rules given us in the case of *Prigg*, in 16 *Peters :*

In the matter of George Kirk.

The police power " extends over all subjects within the territorial limits of the state," yet our statute does not confine its operation within our limits, but provides, in case the fugitive is from another state, for the return of the fugitive back to the place whence he fled.

We " may remove slaves from our borders to secure ourselves against their depredations." To transport the slave to Canada or Connecticut would effect this purpose, yet that is not allowed by our statute. He must in compliance with its command, be returned only to his place of bondage.

" The rights of the owners are not to be interfered with or regulated."

Yet, what is a compulsory return of the slave, with or without his owner's consent, to the place whence he fled, but an interference with or regulation of the master's right to control his movements and govern his person ?

The state regulation is, " not to interfere with the remedy prescribed by congress." Congress has limited the power of recaption to the owner, his agent or attorney, but our state law has removed that limitation. Congress has protected the rights of the owner, by securing the reclamation to him and those appointed by him, yet our statute gives to the commander of the vessel the power of transporting the slave beyond even the reach of the owner.

Such is the result of the rule furnished us by Judge Story. The application of Judge Barbour's tests will be found equally satisfactory and conclusive.

Is the power exercised in this statute one " embracing a matter within the territory of the state, not surrendered to the government, and which can be most advantageously exercised by the state ?" It can not be most advantageously exercised by this state. It can not, indeed, be exercised at all without the consent of the state from which the slave fled. Suppose that any slave state should forbid the return to its territory of a fugitive slave, could our law commanding his return be enforced ? It could be only enforced by the national government.

But to proceed with his tests:

We are to look at the place of its operation to see that the statute operates within the territory of New York; yet the main object of this statute plainly is, not the removal of the slave from our borders, but his return to the place whence he fled, involving of necessity the operation of our statute, without our territory and without our jurisdiction.   Could it be more so if it provided that every vagrant arrested in our streets should be transported to and abandoned in the streets of Savannah?

We are next to look upon the person on whom it operates, to see that he is within the same territory and jurisdicton; yet this statute must of necessity, operate both on the slave and the commander of the vessel more out of the state than in it.   We are next to look at the persons for whose benefit it was passed, to see that they are the people of our state.   Yet this statute does not confine the power of recaption to the commanders of vessels, being citizens — it confers it on all commanders, reside where they may.

We are next to turn our attention to the purpose to be attained, to see that it is to secure that very protection and provide for that very welfare.   The argument is, that this statute had its origin in the desire to protect our citizens from the evil example of having slaves among us; yet that very statute prohibits the removal of slaves from our territory by high penal enactments; and surely if the welfare of our citizens and their security from the evil example of slavery were the object in view, it could be attained as well and far more easily by transporting the slave to a free state, which it prohibits, than to a slave state, which it absolutely commands.  ·

And lastly we are to examine the means by which these ends are to be attained, so that they bear a just, natural and appropriate relation to those ends.   There is no special pleading, no refinement of reasoning, that can disguise from a common understanding the fact that the whole object of the statute was to allow the commander of the vessel to protect himself by retaking and returning the fugitive; and the means used, namely, the examination and adjudication by the mayor, and

his certificate, were natural and appropriate to that end, and to none other. If any other end had been in view — if the protection of our people at large had been aimed at — there would have been something compulsory in the law, something obligatory on the captain to afford us the desired protection. But every thing is left to his discretion. If he pleases he may retake, and, after retaking, if he pleases, he may return the slave to the place whence he fled. If the captain should chance not to be a citizen of this state, it would be difficult to discover how it could benefit this state; yet under no circumstances would it be difficult to see how it could benefit the owner to have his fugitive servant placed again within his reach. In every aspect in which I view this statute, I can not help regarding it as intended and calculated to aid in returning a fugitive slave to his master: and it seems to me that the claimant in this case, and his counsel, have so understood the law, and have acted accordingly. Else why was the boy confined on board the vessel after her arrival here? Why does the captain plead his obligation to the laws of Georgia, when those laws compel him to return the boy to his owner? Or why, when George was making every effort, with the assistance of numerous friends, to escape from the state, did the captain invoke the aid of the police to arrest those efforts; and why does he now press this claim, but that he may do that which the constitution and laws of the United States declare shall be done only by the party to whom the service is due, or his agent or attorney? I do not allude to these considerations for the purpose of even implying a censure upon the commander of the vessel or his owners; but solely with a view of drawing from his acts, and those of his very respectable counsel, the consolation justly flowing, that he and they do, in effect and from necessity, understand our statute precisely as I do, namely, in the language of the United States supreme court, as by way of compliment to the legislation of congress, prescribing additional regulations, and what they deem auxiliary provisions for the same purpose.•

It must have occurred to all who have given this subject much consideration, as it has to me, to observe the extreme

watchfulness with which this provision of our national constitution has been regarded by our courts. It is not worth my while to pause and inquire into the cause or the propriety of this. It is enough to know that whenever any state legislation, attempting to intermeddle with the question, has come before our highest courts, it has without ceremony been swept from the statute book. Our statute regulating and controlling the master's right of reclamation, and allowing to the alleged slave the benefit of the writ of *homine replegiando*, fell before the decision of our supreme court in *Jack's* case. The laws of Pennsylvania, running through a period from 1780 to 1826, and containing a provision like that now under my review, were overturned by the supreme court of the United States in *Prigg's* case; and I only discharge my duty — obey, indeed, merely one of its plainest and most simple dictates — by declaring that the rule of law thus laid down by the highest judicial tribunals in the country, and whose decisions I am bound to respect and to enforce, is applicable to the statute in question, and being applicable renders the statute null and void, and the arrest and detention of Kirk under it improper.

It will be observed that I have omitted to discuss many considerations which were pressed upon me during the argument The view which I have taken of the case rendered their discussion unnecessary, but I will briefly allude to one topic, because, if the danger apprehended were to ensue, it would be the only cause of regret which I should experience growing out of this case. I allude to the penalty which it is averred may fall upon the captain in case of his return to Georgia. I can not persuade myself that there is any cause for the fear.

The slave was concealed on board his vessel without his knowledge or consent. He was not discovered until the limits of Georgia had been passed, and to have returned then to Savannah would not only have vitiated the captain's insurance, but have rendered him liable in an action to the boy; and since his arrival in this port, he has resorted to every means which our law allows to return him to his place of servitude. And if he shall be finally defeated in his attempts, it will not

be from any want of efforts on his part, but from a determination on the part of the authorities of this state, to avoid state usurpation, and to maintain the constitution as it has been interpreted by the highest tribunals in the country. It can not be, that, under such circumstances, he can have any thing to fear from the penal enactments of Georgia.

If, however, contrary to all just calculation, those fears should yet be realized, our regard for the individual may not warp the law from its uprightness, though it may well excite our regrets that its integrity can not be maintained without the infliction of unmerited suffering. This boy must at all events be discharged. The law allows it and the court awards it.

---

SUPREME COURT. At Chambers, New York, August, 1847.
Before *Edmonds*, Circuit Judge.